**Carter VICARS, Plaintiff,**

v.

**John W. GARDNER, Secretary of Health, Education and Welfare, Defendant.**

**Civ. A. No. 67–C–9–A.**

United States District Court
W. D. Virginia,
Abingdon Division.
May 22, 1968.

Carl E. McAfee, Norton, Va., for plaintiff.

James P. Brice, Asst. U. S. Atty., Roanoke, Va., for defendant.

Opinion and Judgment

DALTON, Chief Judge.

In this action plaintiff, Carter Vicars, seeks review pursuant to § 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g), of the final decision of the Secretary of Health, Education and Welfare, defendant, denying him the establishment of a period of disability and disability insurance benefits under §§ 216(i) and 223 of the Act, 42 U.S.C.A. §§ 416(i) and 423.

On February 13, 1963, plaintiff filed an application for disability insurance benefits claiming that he had been physically unable to work since 1953. This onset date was later changed to August 15, 1964. Plaintiff's application was denied by the Bureau of Disability Insurance on December 14, 1964, and on July 28, 1965 upon reconsideration. The case was then brought before a hearing examiner of the Social Security Administration who again denied plaintiff's application after a hearing on August 1, 1966. On February 3, 1967 the Appeals Council denied plaintiff's request for review of the hearing examiner's decision. Plaintiff then instituted the present action in this court to review the Appeal Council's decision, and on March 17,

1967 we remanded the case to the Secretary for further administrative proceedings. Further evidence was heard by the hearing examiner, and on September 15, 1967 the Appeals Council rendered its final decision adopting the findings of the hearing examiner that plaintiff was not entitled to a period of disability or to disability insurance benefits. On October 2, 1967 the case was reinstated on the docket and on January 26, 1968 defendant filed a motion for summary judgment.

The sole question before the court is whether there is substantial evidence to support the Secretary's finding that plaintiff was not disabled within the meaning of the Act.[1] Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964). Plaintiff last met the earning requirements for disability insurance benefits on March 31, 1965 and, therefore, the evidence must show that plaintiff was under a disability for the establishment of a period of disability and for entitlement to disability insurance benefits on or before that date.

In determining whether a claimant is disabled within the meaning of the Act four elements should be considered: "(1) the objective medical facts; (2) the diagnoses, and expert medical opinions of the treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain and disability as found in the testimony of claimant, his wife and neighbors; and, (4) claimant's age, educational background, and work experience." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Upon consideration of these elements, we find that there was substantial evidence to support the Secretary's decision.

Plaintiff is 53 years of age and has a sixth grade education. His work record shows that he has held a number of positions and that his primary occupation is coal mining. He has been a truck driver, a taxi cab driver, a conservationist for the CCC, a new and used car salesman, an automobile mechanic, an automobile parts department manager and an assembly line operator in an automobile plant. According to plaintiff he has also worked in several other places that the Social Security Administration has no record of.

Plaintiff has a lengthy medical record dating back some twenty-nine years to the time he was first admitted to the infirmary of the Civilian Conservation Corps at Jonestown, Virginia while he was working for the CCC in 1939. His chief complaint was migratory pains in his limbs. Dr. James Volpe examined him at the infirmary and found he had moderate swelling of the joints but no irregular "incardiac" rhythm or "adventitins" sounds. His diagnosis was "Rheumatic Syndrome." All other conditions were normal. After this examination plaintiff transferred to Walter Reed General Hospital. The clinical report states: "Patient's physical examination upon admission revealed * * * no limitation of motion, swelling or pain in any joints. Otherwise examination was negative. * * * The knees, shoulders, elbows and wrists are negative for arthritic changes." The diagnosis was: "1. Tonsillitis, acute, follicular, bilateral. 2 Caries, involving pulp R–15." and disposition "cured". Dr. McKie of Walter Reed Hospital did not concur in Dr. Volpe's diagnosis of "Rheumatic Syndrome." The final summary stated that no disability remained.

Plaintiff's next physical examination was upon his induction into the army on March 27, 1943. His condition was found normal except for typhoid 1938 and abdominal visceroptosis.

[1]. Disability is defined in 42 U.S.C.A. § 416(i) (1) (A) (Supp.1967) as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months * * *." The 1965 amendment of this subdivision governs this case because the case was pending at the time of the amendment.

In September, 1943 plaintiff was again examined by the Army Medical Corps. His chief complaint was pains in joints and nervousness. His diagnosis was: No heart disease found. "Arthralgia—chronic, mild, multiple joints, cause undetermined, symptoms EPTE. (Patient's statement.) Neurasthenia—cause undetermined." The final summary stated that plaintiff was admitted with "a history of migratory pains which kept him from doing full duty" but that his course in the hospital was "uneventful" and that in the opinion of both examining doctors he could go back to duty.

On November 27, 1944 plaintiff was admitted to the ASF Regional Hospital, Fort Benning, Georgia, for another military examination. His chief complaint then was pain in knees, ankles, spine, precordial pain and headache. The final summary was: "X-ray of the spine showed slight evidence of ostiochondritis which the orthopedist did not feel to be of clinical significance. (The orthopedist said "I can find no orthopedic disease to account for this man's pain.") * * * No organic basis was found for the pains. * * * Diagnosis: Arthralgias, knees, ankles, thoracic spine, chronic, moderate, cause undetermined."

On January 15, 1945 plaintiff was discharged from the army and his report of physical examination stated: "Feet—Pes cavus. Musculoskeletal defects—Arthritis, chronic, shoulders, knees, ankles, manifested by crepitation and pain on motion. Cardiovascular system— * * No heart disease."

On March 31, 1945 plaintiff was rated by the Veterans Administration for VA benefits and based on his service record showing he had chronic arthritis was found to have a 40% vocational handicap. The rating sheet states: "40% from 1–16–45. Incurred in service in the WWII. * * * ARTHRITIS, CHRONIC, SHOULDERS; KNEES AND ANKLES, MANIFESTED BY CREPITATION AND PAIN ON MOTION."

On February 17, 1945 plaintiff was again rated by the VA after being given a physical on February 4, 1947. The medical record states: "The patient has been aware of Arthritis since the fall of 1943. * * * Some tactile crepitus was noted in the right knee and left wrist. * * * He cannot do any work involving physical effort. * * * Diagnoses: Arthritis, chronic, articular, manifest in shifting pain and crepitus involving at present knees, shoulders and ankles."

On March 3, 1950 plaintiff was re-examined by the VA. He complained that he had pains around his heart and arthritis in his knees, shoulders, back and ankles. His diagnosis was: "1. Rheumatoid Arthritis, Multiple Joint, Mod. SV.—History of—Knees, Shoulders, Elbows, Lumbar Spine, Neck and Ankles. 2. Psychoneurosis, Anxiety State, Moderate. 3. Pes Cavus, Bi-Lateral, Mod. SV.—Mildly Symptomatic."

On January 23, 1952 plaintiff was given an orthopedic examination by the VA after he continued complaining of an aching spine and joints. Only slight soreness and crepitus was found in the lumbar vertebra, knees, and shoulders and none in the ankles. No limitation of motion or abnormal conditions were found as to any other joints.

On December 9, 1964 plaintiff was given a pension examination by Dr. Gordon Carmichael who found: "1. Hypertrophic and perhaps some atrophic and rheumatoid type arthritis of the peripheral joints, moderately severe from time to time with mild to moderate crepitation and pain in the usage of these joints for the ordinary activities required of a man who is qualified only for generalized labor with some deformity of the joints but with no limitation of motion at this time but with pain on weight bearing and extremes of motion. 2. Arthritis of the entire spine, rheumatoid type, mild to moderate. 3. Hypertensive cardiovascular disease, moderate. 4. Pes cavus, bilateral, moderately symptomatic."

On January 5, 1965 plaintiff was re-rated for VA benefits and found 80% unemployable and given a 100% unemployability rating because of his individual unemployability. The medical examination revealed that plaintiff's neck movements were restricted and painful, that his spine had a loss of the normal lumbar curve, that all lateral motions and the extremes of flexion were moderately painful, and that the peripheral joints had moderate crepitation on manipulation. The rating decision stated: "The [plaintiff] is SC for rheumatoid arthritis, entire spine, and multiple peripheral joints presently evaluated at 80% disabling. There are also NSC disabilities of hypertensive cardiovascular disease and pes cavus."

On June 22, 1965 plaintiff was examined by Dr. J. C. Buchanan of the Wise Appalachian Regional Hospital. At this time plaintiff stated his chief complaint to be bad circulation. Dr. Buchanan's report states: "This is a slightly built * * * man of middle age who does not appear acutely ill. * * * No limitation of motion was noted at the shoulder, elbow, wrist or finger joints and no crepitation, enlargement * * * or tenderness was noted at any of these joints. * * * The patient does seem preoccupied with the thought of poor circulation. * * * Rheumatoid factor—negative. * * * There was moderate to marked osteoarthritic changes of the thoracic lumbar vertebrae. X-rays of the left knee showed minimal osteoarthritic changes. Final clinical impressions: 1. Osteoarthritis, general. 2. Pes cavus bilateral. * * 3. Essential hypertension, mild. 4. Pulmonary emphysema. 5. Anxiety state."

On July 8, 1965 plaintiff was examined by a radiologist who determined that there appeared to be very minimal bilateral pulmonary emphysema but marked osteoarthritic changes of the mid and lower thoracic vertebrae. The X-rays showed only minimal osteoarthritic changes in his left knee.

On August 3, 1965 Dr. R. T. Strang, an orthopedist, reported: "I examined the patient today, particularly in reference to arthritis. * * * My impression of this man is that he does not show any evidence of arthritis at this time, at least not enough to disable him."

On August 30, 1965 plaintiff was examined by a psychiatrist, Dr. P. D. Nelson, who reported that plaintiff was quite concerned and preoccupied with various complaints and symptoms in his chest, stomach, back and head and that he was very suspicious and resentful at all those people who had interfered with his attempt to get social security benefits. His psychological tests showed in him "a guardedness, i. e., an attempt to prevent the expression of revealing material." He was diagnosed as having an "involutional type of reaction with some depression and paranoid ideation also." As to plaintiff's overall condition Dr. Nelson added: "From a psychiatric point of view * * * I would suggest that his disability is somewhere in the low moderate range. * * * It may be that this man has more disability when one considers his multiple somatic complaints, his physical illness and his rather poor social and work adjustment in the last few years. I do think that he can be helped with medication, with psychiatric treatment and with some rehabilitation training in an area that would fit into his physical and emotional and intellectual limits of function."

On October 14, 1966 Dr. J. M. Stranghan reported that plaintiff's cervical and lumbo-sacral spines showed some spurring of the vertebral margins and that there was eburnation of the spophyseal (sic) joints. He diagnosed osteoarthrosis.

On October 18, 1966 Dr. L. C. Strong reported: "Osteoarthritis C–3–4 severe. Osteoarthritis L–1–2 moderately severe. These changes are permanent and will be progressive. At present he is unable to work at any strenuous work and unless he is trained at a sedentary job, he

will be unable to hold any permanent position."

On October 21, 1966 Dr. J. S. Powers reported that plaintiff had a number of symptoms which would cause one to think he had a definite organic disease, but no specific ailment was found. Dr. Powers also stated: "The pain which he describes as involving most of his body does not appear to be due to rheumatoid arthritis. I did not have an opportunity to do more detailed diagnostic studies in this catagory, however. * * * The multiplicity of Mr. Vicar's complaints causes one to also be inclined toward the conclusion that a great deal of his disability is on the basis of functional, possibly psychosomatic disease and it may not be possible to document actual organic changes anymore exactly than is outlined above."

On October 31, 1966 Dr. Nelson after examining plaintiff for the fifth time reported that from a psychiatric point of view plaintiff's disability was in the moderate range and that he could improve with medical and psychiatric treatment. Dr. Nelson further stated: "with his continuing complaints, it is difficult to judge improvement while the patient is continuing to explain all of his symptomatology which seems to expand with each interview."

On May 16, 1967 Dr. Nelson recommended that plaintiff not be allowed to use firearms on the job because his judgment was impaired due to his psychiatric disability, his limited intelligence and his spasmatic control of his left hand.

On May 18, 1967 Dr. J. J. Porter, plaintiff's personal physician, reported: "I have never been able to get plaintiff into the hospital for more thorough check-ups. His history suggests to me a psychogenic basis for his various complaints."

In addition to the extensive medical reports, there is subjective evidence adduced by the plaintiff as to his condition. At the hearing before the hearing examiner plaintiff testified that he could not drive a car for any long distance, that he could not work in his garden, that he cannot sell cars because he gets nervous and cannot talk, that he was too nervous to drive a taxi, that he did not have any circulation in his left leg and left arm, that he has spells and cannot bend over or raise his leg, that he has pains in his chest, that his wife has to help him out of bed and that it takes him three hours to straighten up after getting out of bed, that he cannot help around the house or wash the car and that he cannot work at all.

 If the Secretary's findings are supported by substantial evidence they are conclusive and must be affirmed. Substantial evidence is more than a scintilla but less than a preponderance. Thomas, supra. It is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Laws, supra, 368 F.2d at 642. If the evidence is substantial our inquiry must end. Furthermore, "[i]f * * * the evidence is in material conflict on the question of disability, either physically or mentally, the decision of the Secretary resolving the conflict against the plaintiff * * * is made * * * conclusive and binding on this court of review." Williams v. Celebrezze, 353 F. 2d 74, 75 (4th Cir. 1945) (citing district court's opinion).

 Here there is material conflict in the diagnoses and expert medical opinions and in the subjective evidence of pain. Therefore, the Secretary's decision resolving the conflict against the plaintiff must be affirmed.[2] As to the expert evidence although nearly all the treating and examining physicians found

2. On plaintiff's application for disability insurance benefits on February 13, 1963 he stated his impairments to be: "Rheumatic fever, arthritis and curvature of the

spine." When plaintiff was first checked by Dr. Volpe in 1939 he was found to have a "Rheumatic Syndrome," but when Dr. McKie of Walter Reed Hospital ex-

that plaintiff had arthritis, there is considerable conflict in the diagnoses and expert medical opinions of these physicians as to its effect. Of the doctors who examined and treated plaintiff at least two thought that his problems were partially psychosomatic and several thought that his impairments were not disabling. The examining psychiatrist considered plaintiff's disability to be in the low-moderate range and upon subsequent examination in the moderate range, but he further stated that he felt plaintiff's condition was remedial. Moreover, several doctors also intimated that plaintiff was somewhat of a malingerer. It is clear that by no means did all of the physicians who examined plaintiff concur in the significance of his arthritic condition.[3]

In regard to the subjective evidence of pain and disability testified to by plaintiff we find an inconsistency. At the hearing before the hearing examiner plaintiff stated that after a piece of slate fell on his back while he was working in a mine on July 15, 1964 he could not and did not work again. However, the records of at least three coal mining firms show that plaintiff did in fact work after July 15, 1964. According to the records of the Boggs Coal Company plaintiff worked for that company from July 7, 1964 until July 30, 1964 missing only one day of work, July 17, 1964. The company's records do not show the reason plaintiff quit work although according to the records he reported an eye injury on the last day he worked. The records of the Bullion Hollow Coal Company show that plaintiff worked full

eight hour days on August 21, 24, 25 and 27, 1964, loading 10, 7, 9, and 10 cars of coal respectively. The records of the Dale Branch Coal Company show that on October 1, 1964 plaintiff loaded 7½ cars of coal. The records of Bullion Hollow and Dale Branch also do not show the reason for plaintiff's termination. Each of these jobs required considerable physical exertion because the coal cars were loaded by shoveling coal from a stooped or kneeling position. Thus, plaintiff engaged in activities during the period in question inconsistent with his claim that he had severe pains and could not work. Had plaintiff been as physically incapacitated as he said he was, he could not have done this work.

■ Moreover, the examiner seriously questioned the credibility of plaintiff's subjective testimony and with just cause. On several occasions plaintiff's testimony was inconsistent and contradictory. Where the credibility of witnesses is involved the examiner's findings are entitled to great weight. *Laws,* supra.

Material conflict clearly exists in both the expert opinion and in the subjective evidence and the Secretary's resolution of the conflict against plaintiff must be affirmed there being substantial evidence to support his findings.

It is, therefore, adjudged and ordered that the Secretary's decision be affirmed and that summary judgment be entered in his favor.

The clerk is directed to send certified copies of this opinion and judgment to counsel of record.

---

amined him, he did not concur in Dr. Volpe's finding. And there was no subsequent diagnosis of rheumatic fever although plaintiff's medical history often included mention of attacks of rheumatic fever occurring in 1938, 1943 and 1957, none of which are medically supported.

3. Although the Veterans' Administration's finding that plaintiff was 100% disabled is entitled to some weight in assessing plaintiff's condition it does not bind the Secretary. Mischler v. Celebrezze, 227 F. Supp. 754 (E.D.La.1964).